06-0130.061                                    October 13, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BCI AIRCRAFT LEASING, INC.,        )
a Corporation, BCI INVESTMENT      )
2002-5, L.L.C., a Limited          )
Liability Company, and BCI 2002-5, )
L.L.C., a Limited Liability        )
Company,                           )
                                   )
            Plaintiffs,            )        No. 06 C 0130
                                   )
            v.                     )
                                   )
REPUBLIC OF GHANA, a Foreign State,)
MINISTRY OF ROADS AND TRANSPORT    )
FOR THE REPUBLIC OF GHANA, a       )
Foreign State, MINISTRY OF FINANCE )
FOR THE REPUBLIC OF GHANA, a       )
Foreign State, and GHANA AIRWAYS   )
LIMITED GOVERNMENT TASK FORCE, a   )
Foreign State,                     )
                                   )
            Defendants.            )


**MEMORANDUM OPINION**

        Before the court is defendants' motion to dismiss the
complaint for lack of jurisdiction pursuant to Federal Rule of
Civil Procedure 12(b)(1), (2), (3) and (5), or, in the alternative,
on the grounds of <u>forum non conveniens</u>.  For the reasons stated
below, defendants' motion is granted.


**BACKGROUND**

        The following relevant facts, drawn from the Complaint, are
taken as true for purposes of this motion.  BCI Aircraft Leasing,

-2-

Inc. ("BCI") is an Illinois corporation with its principal place of business in Chicago, Illinois.  BCI is a commercial aircraft leasing company which sells, purchases and leases commercial aircraft, including air frames and engines.  BCI 2002-5, L.L.C. ("BCI 2002-5") is a Delaware limited liability company and wholly owned subsidiary of BCI Investment 2002-5 L.L.C.  The aircraft at issue are owned in trust by Wells Fargo Bank Northwest, N.A.  BCI 2002-5 is the beneficial owner in trust.  BCI Investment 2002-5 L.L.C. ("BCI Investment 2002-5") is a Delaware limited liability company and wholly owned subsidiary of BCI.  BCI, BCI 2002-5, and BCI Investment 2002-5 are collectively referred to as "plaintiffs."

The Republic of Ghana ("Ghana" or the "Government") is a sovereign state recognized by the United States of America.  The Ministry of Roads and Transports for the Republic of Ghana ("Ministry of Roads and Transports") is an agency or instrumentality of Ghana located in Accra, Ghana.  The Ministry of Finance for the Republic of Ghana ("Ministry of Finance") also is an agency or instrumentality of Ghana located in Accra, Ghana.

The Ghana Airways Government Task Force ("Government Task Force") is an agency or instrumentality of Ghana.  Ghana dissolved the Board of Directors of Ghana Airways Limited ("Ghana Airways") and appointed the Government Task Force to oversee and restructure Ghana Airways.  The Government Task Force consists of the following individuals: Mr. Gustave A. Mate Azu (Chairman), Mr. Frank Okyne,

-3-

Mrs. Frances Adu-Mante, and Mr. Kojo Andah.  Ghana's High Commissioner, Mr. Isaac Osei, was appointed as adviser to the Government Task Force.

Ghana, the Ministry of Roads and Transports, the Ministry of Finance and the Government Task Force are collectively referred to as "defendants."

In 2003, a BCI third-party consultant contacted BCI regarding the possibility of leasing two DC-10 aircraft to Ghana Airways.  Ghana Airways is the national airline of Ghana, which is the sole shareholder of the company.  BCI and Ghana Airways negotiated the terms of a contract whereby BCI would lease the two aircraft and six engines to Ghana Airways.  During the negotiations, Ghana Airways sent BCI a $100,000 deposit to BCI's Bank in Oak Brook, Illinois, which was required by BCI prior to entering into a letter of intent.  Ultimately, the parties agreed to a six month lease whereby Ghana Airways would lease the BCI aircraft for $2,000 per hour with a 200-hour minimum per aircraft per month (hereinafter referred to as the "Lease Agreements").

Ghana Airways flew approximately 10 employees to the Mojave Desert, California, where the DC-10 aircraft were located.  The Ghana Airways employees, in conjunction with BCI employees, performed maintenance on the aircraft, which was required before they could be sent to Ghana for service in Ghana Airways' air fleet.  In an effort to prepare the aircraft for service, BCI

-4-

expended over $400,000.  Ghana Airways took possession of the aircraft in California, and Ghana Airways pilots flew them from California to Ghana.  The first aircraft left for Ghana on or about October 23, 2003.  The second aircraft left for Ghana on or about November 24, 2003.  Prior to allowing Ghana Airways to take possession of the aircraft, BCI required Ghana Airways to pay the first month's rent on the aircraft and engines.  On October 22, 2003, Ghana Airways wired its payment to BCI's bank in Ohio from Ghana Airway's bank in New York, New York.

In October or November 2003, Ghana Airways began flying the DC-10 aircraft to and from Ghana and the United States.  This included flights to Baltimore, Maryland and New York, New York.  By December 2003, Ghana Airways defaulted on its lease payments to BCI.  Although Ghana Airways made minimal payments each month, its debt to BCI grew.  Starting in July of 2004, Ghana Airways failed to make any payments to BCI for the leases of the aircraft, which were still in the airline's possession.

In April 2004, BCI personnel visited Ghana in an attempt to resolve Ghana Airway's outstanding debt, and to propose options whereby the airline could increase its profitability and efficiency.  BCI also proposed that the parties extend the lease, and offered Ghana Airways a payment plan whereby it could gradually pay off its debt to BCI.  Among these meetings was a meeting between BCI and the Minister of Finance, who indicated that he

-5-

"wrote the checks" for Ghana Airways.  However, the parties were unable to come to any resolution on the matter by the time BCI personnel left Ghana.  BCI was therefore forced to ground the aircraft.[1]

After the aircraft were grounded, Ghana Airways agreed to pay immediately a portion of the debt owed to BCI.  In addition, Ghana Airways executed extension agreements for the original six-month Lease Agreements.  With Ghana Airways' (and Ghana's) assurances of payment in place, BCI cleared the planes for flight.

Approximately one month later, the CEO of Ghana Airways exercised an option under the lease extension to terminate the leases.  The terminations were to take effect on August 9, 2004 for one aircraft and September 9, 2004 for the other.  However, even though they were still in possession of and using the aircraft, Ghana Airways failed to make the necessary payments.

In July of 2004, Ghana Airways was still in default under the lease agreements, owing BCI at least $3,000,000 in delinquent lease payments.  BCI made written demands for the back lease payments.  Ghana Airways indicated it would make a payment of $300,000 in an effort to reduce its debt to BCI.  Ghana Airways repeatedly promised to execute a lease extension for the aircraft and pay down its debt.  Although it made payments in July of 2004,

---

[1]The complaint does not indicate where the aircraft were at the time they were grounded, or what steps BCI took to prevent the aircraft from flying.

-6-

the payments did not reduce Ghana Airways' debt to BCI, nor did Ghana Airways execute a lease extension for the aircraft.

During the course of the lease extension negotiations, one of the DC-10 aircraft was grounded by the FAA for the poor maintenance and condition of the aircraft. BCI had no obligation under the Lease Agreements for the maintenance or condition of the aircraft during the term of the Lease Agreements. BCI contacted Ghana Airways several times, advising it of the actions it needed to take to prove to the FAA that the appropriate maintenance had been performed. Despite BCI's efforts, Ghana Airways failed to take the necessary actions, and the aircraft remained grounded.

In an effort to resolve the matter, BCI gave Ghana Airways until early August to make a payment on the aircraft. When Ghana Airways failed to make this payment, BCI grounded the second aircraft. BCI also requested return of the aircraft to BCI, as required by the lease provisions. On or about August 20, 2004, BCI also demanded the return of two engine stands, which BCI had supplied to Ghana Airways but which Ghana Airways had failed to pay for. The cost of the engine stands is approximately $245,000 each. At its own expense, BCI obtained a ferry permit from the FAA and ferried the grounded DC-10 aircraft to a maintenance facility in Arizona. Following numerous requests from BCI, Ghana Airways ultimately ferried the second DC-10 aircraft to the same facility in Arizona.

-7-

Plaintiffs also make reference to an incident in January 2004, when one of the DC-10 aircraft engines suffered a malfunction after ingesting a foreign object.  Under the Lease Agreements, BCI had no liability or responsibility for either the repair, service or maintenance of the engine or aircraft.  Nonetheless, BCI assisted Ghana Airways in the restoration of the engine so that Ghana Airways could resume flights to Ghana.  BCI sent a borescope team to Baltimore to assist Ghana Airways with the restoration and repair of the engine.  Ghana Airways did not have the available resources to pay for the engine repairs.  BCI therefore expended almost $600,000 in its efforts to assist Ghana Airways with the service and restoration of the engine.

Ghana Airways promised to reimburse BCI for the expenditures, both orally and in writing, when Ghana Airways received the insurance claim proceeds.  Under the Lease Agreements, Ghana Airways was solely responsible for incidents that occurred while the aircraft was being operated by it and while the aircraft was under its control.  BCI assisted Ghana Airways with the submission of the claim to Ghana Airway's insurance company by corresponding with its insurance agent and by sending field reports and other documentation of the engine restoration to the insurance company.  Ghana Airways, however, never repaid BCI for this expenditure.

On August 13, 2004, the Secretary to the President of

-8-

Ghana, Mr. D.K. Osei, issued and signed a statement that Ghana had dissolved the Board of Directors of Ghana Airways. Ghana then appointed a Government Task Force to oversee and restructure Ghana Airways. In the statement, Mr. Osei also announced that Ghana had "decided to assume responsibility for the airline's outstanding debts." These debts included those the airline owed to BCI. The statement was signed by Mr. Osei.

On August 19, 2004, BCI sent a letter to Mrs. Akua Sarpong, CEO of Ghana Airways, enclosing a final invoice for the debts owed BCI. The debt for the lease payments totaled $3,242,290.38. The outstanding debt for the repair of the DC-10 engine totaled $597,475. BCI also sent the invoice to the Minister of Roads and Transport, the Minister of Finance, the President of Ghana, the Ambassador of Ghana and the U.S. Ambassador to Ghana. On August 26, 2004, BCI received the utilization reports for the aircraft. Contrary to earlier representations, Ghana Airways had used the aircraft far in excess of the 2,000 hour minimum. BCI therefore sent a new invoice to the Government Task Force, which detailed the charges for Ghana Airways' use of the aircraft. The final invoice for the lease payments totaled $5,458,824.12.

In addition, upon inspection of the aircraft, BCI discovered that Ghana Airways had failed to properly maintain the aircraft and keep records of maintenance performed (or not performed) as required by the lease. As a result, the aircraft

have no commercial value as operating aircraft.  BCI's inability to lease the planes to any other entity has caused significant financial damage to BCI.

Throughout August 2004, BCI and the Government Task Force had several conversations relating to the payment of Ghana Airways' outstanding debt to BCI.  By August 30, 2004, BCI still had not received any payment.  BCI sent another letter to the Government Task Force pleading for a resolution of the matter, so the parties would not have to resort to litigation.  On August 31, 2004, BCI received a letter from the Government Task Force Chairman, Gustav Mate Azu ("Azu").  Azu once again represented that Ghana would be assuming all outstanding debts owed to BCI, and stated that the Governmental Task Force would be meeting with BCI in an effort to resolve the debts.  On September 8, 2004, Azu sent another letter to BCI, reiterating Ghana's intention to settle Ghana Airways' indebtedness to BCI.

On September 30, 2004, the Deputy Minister of Roads and Transport sent a letter to BCI at its headquarters in Chicago.  The letter reiterated Ghana's promise to pay Ghana Airways' outstanding debts:

> The Government of Ghana ("GoG"), the sole shareholder in Ghana Airways Limited (GH), has expressed its intention to assume the liabilities of the airline including all known and unknown debts as of 31st August, 2004.

The letter further stated that a government-appointed Debt

-10-

Committee would contact BCI in an effort to resolve any outstanding liabilities.

On December 30, 2004, BCI received another communication from the Deputy Minister of Roads and Transports.  The letter again referred to Ghana's "intention ... to assume the liabilities of GH as of August 31st, 2004."  In reliance on the statements by Ghana, BCI refrained from pursuing collection of Ghana Airways' outstanding debt in court.  However, despite its repeated promises, which were in writing and signed by agents of Ghana, defendants failed to pay Ghana Airways' debt to BCI.  To date, defendants have failed to pay BCI any of the debt.

Plaintiffs' complaint is in five counts.  Counts I and II are for breach of promise to pay Ghana Airways' outstanding debts.  Count I deals specifically with obligations under the Lease Agreements, while Count II deals with reimbursement for the repair and restoration of the engine in January 2004.  Count III asserts a claim of promissory estoppel based upon the representation by the Minister of Finance to BCI that the Ministry of Finance paid the bills of Ghana Airways.  Count IV is a quantum meruit claim, seeking compensation for the goods and services rendered to Ghana Airways.  Finally, Count V is a claim for fraudulent misrepresentation based upon the assertions made by Ghana through the Ministry of Finance, the Ministry of Roads and Transport and the Government Task Force that it would be responsible for Ghana

-11-

Airways' outstanding debts.  Plaintiffs claim that each time Ghana stated its intention to assume the debts it knew or believed such statements were false, and that BCI justifiably relied upon Ghana's representations.

Defendants now move to dismiss all counts of the complaint, claiming sovereign immunity.  In the alternative, defendants move to dismiss this action on the grounds of <u>forum non conveniens</u>, arguing that Ghana is the appropriate forum for this action.

## <u>DISCUSSION</u>

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for lack of subject matter jurisdiction.  In reviewing such a motion, the court must accept as true all the factual allegations contained in the complaint.  <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 164 (1993).  If a complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction, the movant may use affidavits and other materials to support the motion.  <u>United Phosphorus, Ltd. v. Angus Chem. Co.</u>, 322 F.3d 942, 946 (7th Cir. 2003).  The burden of proof on a 12(b)(1) motion is on the party asserting jurisdiction.  <u>Id.</u>

Defendants first contend that the doctrine of sovereign immunity requires dismissal of this action.  Plaintiffs counter that defendants are not entitled to sovereign immunity in this case

-12-

because they have engaged in commercial activities.

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country. Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993). Under the FSIA, the United States courts lack jurisdiction over all foreign states unless one of the Act's exceptions applies. 28 U.S.C. § 1604. FSIA applies to instrumentalities and agencies of the foreign sovereign, as well as to the state itself. See 28 U.S.C. § 1603(a), (b). The ultimate burden of proving immunity rests with the foreign state. Int'l Ins. Co. v. Caja Nacional de Ahorro y Seguro, 293 F.3d 392, 397 (7th Cir. 2002) (citing Alberti v. Empresa Nicaraguenese De La Carne, 705 F.2d 250, 255 (7th Cir. 1983)). See also Princz v. Fed. Republic of Germany, 26 F.3d 1166, 1171 (D.C. Cir. 1994) ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable.").

The parties dispute whether the FSIA exception set forth at 28 U.S.C. § 1605(a)(2) applies to this case. Section 1605(a)(2) provides as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> ...
> (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;

-13-

> or [3] upon an act outside the territory
> of the United States in connection with a
> commercial activity of the foreign state
> elsewhere and that act causes a direct
> effect in the United States[.]

28 U.S.C. § 1605(a)(2). Plaintiffs contend that defendants'
activities satisfy the requirements of both the first and third
clauses.

In order to determine whether the defendants are immune
from suit, we must answer two related questions: (1) whether the
defendants engaged in a "commercial activity" in the United States
or abroad; and (2) if so, whether this activity bears a significant
relation to the United States, and whether the plaintiffs' action
is based upon the defendants' commercial activity. Rush-
Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d
574, 577 (7th Cir. 1989).

Commercial activity is defined in the FSIA as

> either a regular course of commercial conduct
> or a particular commercial transaction or act.
> The commercial character of an activity shall
> be determined by reference to the nature of
> the course of conduct or particular
> transaction or act, rather than by reference
> to its purpose.

28 U.S.C. § 1603(d). "An important starting point in determining
whether a particular transaction or course of action constitutes
'commercial activity' is the Act's admonition that the court look
to the conduct's nature, rather than its purpose." Hellenic
Republic, 877 F.2d at 577. The Seventh Circuit has stressed that

-14-

"the command of Congress embodied in 28 U.S.C. § 1603(d) requires that [the court] confine any consideration of purpose as closely as we can, considering that purpose <u>only so far as is absolutely necessary</u> to define the nature of the act in question."  <u>Id.</u> at 577-78 (emphasis in original) (quoting <u>Segni v. Commercial Office of Spain</u>, 835 F.2d 160, 164 (7th Cir. 1987).

     In determining the nature of the foreign state's action, an important inquiry is whether a private person could have engaged in similar conduct.  <u>Hellenic Republic</u>, 877 F.2d at 578.  If a private person could have engaged in the same type of activity, then the sovereign has presumptively engaged in "commercial activity" within the meaning of the FSIA.  However, if no private party could have engaged in the challenged conduct, then the conduct is a sovereign act, and the foreign state is immune from suit.  <u>Id.</u>

     Plaintiffs contend that defendants engaged in commercial activity by operating Ghana Airways and by guaranteeing its debts. Defendants dispute both of these assertions.


## 1. Operation of Airline

     Plaintiffs first argue that defendants' ownership and operation of the airline was a commercial activity.  Defendants counter that the mere ownership and majority control of the Board of Directors do not establish a principal-agent relationship under the FSIA.

-15-

"[G]overnment instrumentalities established as judicial entities distinct and independent from their sovereign should normally be treated as such." First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 626-27 (1983) ("Bancec"). The presumption of independence can be overcome in two situations.   The first is where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is formed.  Id. at 629.  The second is where recognition of the instrumentality as an entity apart from the state would work fraud or injustice.  Id.  Plaintiffs argue that both situations are present in this case.

With regard to the question of the existence of a principal-agent relationship, both sides point to Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438 (D.C. Cir. 1990).  As that court stated:

> It is not enough to show that various government entities or officials represent a majority of the shareholders or constitute a majority of the board of directors of the applicable agency or instrumentality; in other words, mere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA.

Foremost-McKesson, 905 F.2d at 440.  Rather, the court must consider whether the defendants so dominated the operations of the company that a principal-agent relationship is created.  Id. Plaintiff bears the burden of asserting facts sufficient to

-16-

withstand a motion to dismiss regarding the agency relationship.
Id. at 447.

Majority shareholding and majority control of a board of
directors, without more, are not sufficient to establish a
relationship of principal to agent under FSIA.   Id. at 448.
Rather, as the District of Columbia Circuit has stated:

> At a minimum ... we can confidently state that
> the relationship of principal and agent does
> not obtain unless the parent has manifested
> its desire for the subsidiary to act upon the
> parent's behalf, the subsidiary has consented
> so to act, the parent has the right to
> exercise control over the subsidiary with
> respect to matters entrusted to the
> subsidiary, and the parent exercises its
> control in a manner more direct than by voting
> a majority of the stock in the subsidiary or
> making appointments to the subsidiary's Board
> of Directors.

Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d
843, 849 (D.C. Cir. 2000) (citing Restatement (Second) of Agency §
1).  Courts have held that extensive involvement by the government
entities in the day-to-day operations of the instrumentality will
establish an agency relationship.  See California v. NRG Energy
Inc., 391 F.3d 1011, 1025 (9th Cir. 2004) ("no evidence suggests
that BC Hydro exerted the day-to-day control over PowerEx that
would demonstrate an agency relationship," BC Hydro immune under
FSIA); McKesson Corp. v. Islamic Republic Of Iran, 52 F.3d 346, 352
(D.C. Cir. 1995) (principal-agent relationship found where Iranian
government made routine business decisions and was involved in the

-17-

day-to-day operations of dairy).

Plaintiffs contend that three factors demonstrate that defendants had complete dominion and control over Ghana Airways' operations and finances. However, none of these factors, either individually or collectively, support a finding of a principal-agent relationship in this case. First, plaintiffs argue that defendants failed to observe proper corporate formalities between a corporation and a shareholder. The Republic of Ghana removed the airline's Board of Directors and management "in one fell swoop" and appointed the Government Task Force, a government agency, to serve as both board and management. However, a sovereign does not create an agency relationship by appointing a corporation's Board of Directors. <u>Transamerica</u>, 200 F.3d at 849. Plaintiffs also allege that government officials often traveled on the airline without purchasing a ticket. However, this allegation does not establish control of Ghana Airways by defendants, and plaintiffs do not cite legal support to the contrary.

Second, plaintiffs contend that defendants controlled Ghana Airways' operations. In support of this allegation, plaintiffs point to the Government Task Force officially appointed by the Republic of Ghana in August 2004. Two of the government officials appointed to the board, Messrs. Azu and Okyne, allegedly were involved in the day-to-day operations of Ghana Airways since at least April 2004. These two officials met with BCI representatives

-18-

and assured them that the airline would continue to be operational.
These allegations also do not support the existence of a principal-
agency relationship.

A similar argument was considered and rejected by the
District of Columbia Circuit in <u>Transamerica</u>.  In <u>Transamerica</u>,
plaintiffs had leased maritime equipment to CAVN, a shipping
company owned by the Republic of Venezuela.  CAVN encountered
financial difficulties and hired a consulting firm, which
recommended that CAVN restructure its operations.  As part of the
restructuring, CAVN's Board of Directors appointed a Captain
Sierraalta, a maritime professional and officer in the Venezuelan
Navy, with full power and authority to head a new intermodal
division and directed him to implement the consulting firm's
recommendations for restructuring.  After describing the extensive
changes Capt. Sierraalta made in that managerial capacity and
noting that "'the [B]oard of [Directors] was aware of [the] details
...' of these efforts," the district court concluded that the
Government, "through the appointment of Capt. Sierraalta,
effectively commandeered the principal intermodal operations of
CAVN" and therefore had assumed control of its day-to-day
operations.

The Court of Appeals rejected the reasoning of the district
court and found no agency relationship:

> These findings, however, describe nothing more
> than the sole shareholder exercising its

-19-

> influence, through the Board of Directors, to
> put its own chosen manager in charge of a
> corporation that was suffering severe
> operational problems-and leaving to him the
> task of running "day-to-day" operations.   If
> that were enough to make the shareholder
> answerable for the acts of the corporation,
> then the holding of Foremost-McKesson that
> majority stock ownership and control over the
> Board of Directors are insufficient to
> transform parent to principal and
> instrumentality to agent would be limited to
> cases in which the shareholder is utterly
> quiescent;  let it exert itself at all to
> protect its interests and it loses its legal
> identity separate from that of the
> corporation.   That is not the law.

Transamerica, 200 F.3d at 851.  We find this reasoning applicable

to the present case.   Defendants' actions regarding the Ghana

Airways' board and the Government Task Force are consistent with

those of a sole shareholder exercising its influence over a

troubled subsidiary.  They do not rise to the level of a principal-

agent relationship.

Third, plaintiffs allege that defendants controlled Ghana

Airways' finances.  During a meeting with BCI representatives, the

Minister of Finance allegedly stated that he "wrote the checks" for

the airline.[2]   However, plaintiffs' claims that the Ghanaian

Government offered to back Ghana Airways do not establish a

---

[2]Plaintiffs also believe that further discovery would reveal even
greater control over Ghana Airways by defendants.  However, while discovery
may be used to confirm specific facts that have been pleaded as a basis for
enforcing the commercial activities exception, it cannot supplant the
pleader's duty to state those facts at the outset of the case.  Arriba Ltd. v.
Petroleos Mexicanos, 962 F.2d 528, 537 n. 17 (5th Cir. 1992).  Additional
discovery therefore would not assist plaintiffs in this case.

-20-

principal-agent relationship.  Again, _Transamerica_ is instructive.
There, the Venezuelan government had decided to inject funds into
CAVN as part of the restructuring plan, and another government
entity had entered into a trust agreement with CAVN so that CAVN
could "satisfy its debts and attain liquidity."   The Court of
Appeals found that "the infusion of state capital to cover CAVN's
losses was a normal aspect of the relation between a government and
a government-owned corporation, not an instance of 'day-to-day'
involvement in the affairs of the corporation, and hence does not
tend to justify stripping Venezuela of its sovereign immunity."
_Transamerica_, 200 F.3d at 852.  Similarly, offers by the Ghanian
government to cover Ghana Airways' debts were a normal aspect of
the  relation  between  a  government  and  a  government-owned
corporation, not an instance of "day-to-day" involvement in the
affairs of the corporation.[3]

        Plaintiffs  also  contend  that  Ghana  Airways'  commercial
activity  should  be  deemed  Defendants'  activity  because  to  do
otherwise would cause a grave injustice.  _Bancec_, 462 U.S. at 629.
BCI  has  alleged  that  it  relied  on  defendants'  statements  and
actions in releasing the aircraft for flight and in continuing to
lease the aircraft to Ghana Airways.  They contend that defendants
directly  benefitted  from  the  continued  leasing  of  the  aircraft

_____

        [3]Although defendants' offer to cover Ghana Airways' debt does not
establish  a  principal-agency  relationship,  the  act  by  itself  may  be  a
commercial  act  for  FSIA  purposes.   _See infra_  at  23.

-21-

because, without the aircraft, Ghana Airways could not operate. Defendants also allegedly benefitted from the continued leasing of the aircraft because government officials flew on the aircraft without paying for their tickets.  However, the court agrees with defendants that there is no grave injustice in not attributing the acts of Ghana Airways to defendants, as plaintiffs have failed to show that the relationship between defendants and  Ghana Airways was the equivalent of a principal-agent relationship.  Indeed,  it arguably would be an equal injustice to allow plaintiffs to seek recovery from defendants for the debts of Ghana Airways without a showing of a sufficient connection between them.

    The cases cited by plaintiffs are distinguishable.  <u>Bancec</u>, <u>supra</u>, dealt with a suit brought by a state-owned Cuban bank (Bancec) against Citibank to recover an unpaid letter of credit. After the suit was filed, the Cuban bank was dissolved by the government and its assets were transferred to other government entities.  After the dissolution, Citibank sought a setoff for the value of its branches that had been seized by the Cuban government. Subsequently,  Bancec's assets were again transferred to another entity.  The Supreme Court found for Citibank on its setoff claim, finding that Bancec had been an alter ego of the Cuban government. The Court further determined that the Cuban transferee entities were not entitled to sovereign immunity.

        Giving effect to Bancec's separate judicial
        status in these circumstances, even though it

-22-

> has long been dissolved, would permit the real
> beneficiary of such an action, the Government
> of the Republic of Cuba, to obtain relief in
> our courts that it could not obtain in its own
> right without waiving its sovereign immunity
> and answering for the seizure of Citibank's
> assets–a seizure previously held by the Court
> of Appeals to have violated international law.
> We decline to adhere blindly to the corporate
> form where doing so would cause such an
> injustice.

Bancec, 462 U.S. at 632.  This situation is clearly distinguishable

from the present case, as plaintiffs have failed to provide

evidence that Ghana Airways lacked independence from the Ghanian

government.

The second case cited by plaintiffs, Hystro Products, Inc.,

v. MNI Corp., 18 F.3d 1384 (7th Cir. 1994), also is distinguishable.

In Hystro Products the plaintiff brought suit against the parent of

a corporation that had not paid it for certain goods before ceasing

operation.  The jury awarded damages to plaintiff, finding that the

subsidiary was the alter ego of the parent.  The Seventh Circuit

affirmed on the grounds that a reasonable jury could have concluded

that the parent and the subsidiary had failed to maintain their

separate identities, and that the parent allowed the subsidiary to

continue to place orders "knowing that it would 'stiff' [plaintiff]

on the final bill."  Id. at 1390-92.  Again, this case involved a

situation where independence between the subsidiary and defendant

parent was lacking, a situation unlike the present case.

We do not believe that plaintiffs' allegations regarding

-23-

control of Ghana Airways by defendants, when viewed as a whole, are sufficient to rebut the presumption of independence between them. See Transamerica, 200 F.3d at 850-51. As a result, plaintiffs have failed to establish that defendants' activities in connection with the operation of Ghana Airways were commercial activities under the FSIA. Because these activities were not commercial activities under the FSIA, we need not reach the question of whether these activities occurred in the United States or caused a direct effect in the United States.

**2.        Guarantee of Airline's Debts**

Plaintiffs also contend that defendants engaged in a commercial activity by guaranteeing to pay the airline's debt. In support of this contention they cite two cases, Tifa Ltd. v. Republic of Ghana, 692 F. Supp. 393 (D. N.J.1988), and Gemini Shipping, Inc. v. Foreign Trade Organization for Chemicals and Foodstuffs, 647 F.2d 317 (2d Cir. 1981). In Tifa, the plaintiff contracted to sell pesticides and related equipment to a Ghanaian company called Sunrise in connection with a national campaign to eradicate pests. The Republic of Ghana agreed to guarantee payment to Tifa, and Tifa indicated that it entered into the contract with Sunrise in reliance on the guarantee. The court concluded that the promise to pay for the pesticides and the related equipment was a commercial activity. Tifa, 692 F. Supp. at 401. "This alleged

-24-

promise was to pay for pesticides and related equipment, the type of activity in which a private person could have engaged; it is not by its very nature governmental as the award of a military contract might well be." Id.

The court in Gemini Shipping reached a similar conclusion. In Gemini Shipping, Tafco was an organization wholly owned by the Syrian government that purchased food for consumption in Syria. Syriamar was an organization wholly owned by the Syrian government that hired ships for use by the Syrian government. Tafco purchased rice in the United States and Syriamar contracted with a Belgian corporation for the shipping. The Belgian corporation in turn secured shipment for the rice through Gemini. Gemini hired a ship, which set sail for Syria after being loaded with the rice. While in transit, Gemini became concerned about the Belgian corporation's ability to pay the freight charges and the demurrage (should it be incurred) and telexed Tafco that it intended to exercise its right of lien over the cargo. Tafco and Syriamar telexed Gemini indicating that it had already paid the Belgian corporation for the freight, but that they guaranteed to pay any demurrages. The Belgian corporation paid Gemini for the freight charges while the ship was still in transit. However, Gemini incurred demurrage due to substantial delays in unloading the rice in Syria. After unsuccessfully trying to recover the demurrage from the Belgian corporation, Gemini Shipping sued Tafco and Syriamar on their

-25-

guarantee to cover any demurrage incurred by Gemini.

The district court dismissed the action based upon claims by Tafco and Syriamar of sovereign immunity, but the Second Circuit reversed.   The court found that it was "beyond doubt" that the actions of Tafco and Syriamar were commercial under 28 U.S.C. § 1603(d).   Gemini Shipping, 647 F.2d at 319.   "The suit is 'based upon' the commercial activity because the guarantee was part and parcel of the rice sale.   It was made when Gemini threatened to exercise its lien, and was breached after Gemini released the grain."   Id.

We find Tifa and Gemini Shipping applicable to the present case, and that defendants' promise to guarantee the debts of Ghana Airways was a commercial activity for FSIA purposes.   Plaintiffs agreed to extend the aircraft leases and unground the aircraft as a result of defendants' promise, and defendants' guarantee was an activity in which a private citizen could engage.

Defendants contend that Tifa and Gemini Shipping are distinguishable because in both cases the government defendant was the primary beneficiary of all of the contracts, and the debts at issue were accrued only after the government gave its guarantee.   However, defendants offer no legal support regarding the significance of this distinction, nor is the court aware of any.

Defendants also contend that they are immune under the FSIA because "the Government of Ghana was regulating its economy through

-26-

the government bailout of a vital national industry." Reply at 12.
As a result, it was not engaging in an activity in which private
parties engage.  However, the court does not agree with defendants'
characterization of their actions.   In this case, defendants, as
sole shareholders, were lending financial assistance to a troubled
company.  Such actions are not sovereign in nature.  Rather, they
are of a type that a private party also could engage in.  <u>See
Republic of Argentina v. Weltover</u>, 504 U.S. 607, 614-15 (1992) ("a
contract to buy army boots or even bullets is a 'commercial'
activity, because private companies can similarly use sales
contracts to acquire goods").  While the <u>purpose</u> of defendants'
acts may have been to regulate the country's economy, the <u>nature</u> of
their actions was nothing more than providing financial assistance
to a troubled corporation.  Because a private party could have
engaged in the same type of activity, defendants have engaged in
"commercial activity" within the meaning of the FSIA.  <u>See Hellenic
Republic</u>, 877 F.2d at 578.

     Defendants contend that "the bailout of a corporation or
industry is a quintessential sovereign act."   Reply at 11.
However, the mere fact that sovereigns perform such acts does not
mean they are not commercial activities for FSIA purposes.  Indeed,
private entities commonly provide financial assistance to troubled
companies, including airlines.  <u>See, e.g.,</u> Susan Carey, Kathryn
Kranhold, and Melanie Trottman, <u>GE's Bailouts of Troubled Carriers</u>

-27-

Divide Airline Industry, Wall St. J., Mar. 31, 2005, at B1.

Defendants argue that cases such as Saudi Arabia v. Nelson, 507 U.S. 349 (1993) and other cases where the sovereign regulated commerce, rather than participated in commerce, are applicable. However, in the cases cited by defendants the foreign state engaged in activities that could not be performed by a private party.  See Nelson, 507 U.S. at 361 (wrongful arrest, imprisonment and torture of plaintiff not a commercial activity); de Sanchez v. Banco Central de Nicaragua, 770 F.2d  1385, 1393-94 (5th Cir. 1985) (rationing of foreign currency to avert economic crisis not a commercial activity); Beg v. Islamic Republic of Pakistan, 353 F.3d 1323, 1326 (11th Cir. 2003) (exercise of eminent domain not a commercial activity); Rong v. Liaoning Provincial Gov't, 362 F. Supp. 2d 83, 96 (D.D.C. 2005) (expropriation of property by state not a commercial activity); Int'l Ass'n of Machinists & Aerospace Workers v. Org. of Petroleum Exporting Countries, 477 F. Supp. 553, 568-69 (C.D. Cal. 1979) (participation in oil cartel involved regulation of exploitation of natural resources, not a commercial activity).

Defendants further contend that the continued operation of Ghana Airways had severe implications for the economy, image and prestige of Ghana, requiring government intervention to encourage commerce in Ghana as a whole.  However, as plaintiffs point out, defendants' motive for acting is irrelevant.  See Weltover, 504

-28-

U.S. at 617 ("it is irrelevant _why_ Argentina participated in the bond market in the manner of a private actor; it matters only that it did so."). "Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the _type_ of actions by which a private party engages in 'trade and traffic or commerce[.]'" _Id._ at 614 (quoting Black's Law Dictionary 270 (6th Ed. 1990)).

In light of the foregoing, we conclude that defendants' offer to guarantee the debts of Ghana Airways constituted a commercial act under the FSIA. This finding does not end the inquiry, however. We must next determine whether defendants' commercial activities either occurred in the United States or had a direct effect in the United States before we can find a waiver of sovereign immunity.

### a. Defendants' Commercial Activities in the United States

To satisfy the first clause of the commercial activity exception, plaintiffs must show that the action is based upon defendants' commercial activities in the United States. _See_ 28 U.S.C. § 1605(a)(2). The Seventh Circuit has stated that a claim is "based upon" events in the United States if those events establish a legal element of the claim. _Santos v. Compagnie Nationale Air France_, 934 F.2d 890, 893 (7th Cir. 1991). As the _Santos_ Court explained:

-29-

> An action is based upon the elements that
> prove the claim, no more and no less.  If one
> of those elements consists of commercial
> activity within the United States or other
> conduct specified in the Act, this country's
> courts have jurisdiction.

Id.  The only alleged commercial activity by defendants is their

promise to pay Ghana Airways' debt.  Plaintiffs have not alleged

that this occurred within the United States, so the first clause of

the commercial activity exception does not apply to this

allegation.  Id.

Plaintiffs also argue that defendants performed an

obligation of the lease in the United States when Ghana Airways,

under the control of the Government Task Force, ferried one of the

aircraft back to BCI in September 2004 to a facility in Arizona.

However, this act does not qualify as commercial activity by

defendants in the United States, as it is not an element that

proves any of plaintiffs' claims.

Plaintiffs have failed to allege conduct that satisfies the

first clause of the commercial activity exception.

### b. Direct Effect of Defendants' Commercial Activities in the United States

The third clause of Section 1605(a)(2) applies when the

action is based "upon an act outside the territory of the United

States in connection with a commercial activity of the foreign

state elsewhere and that act causes a direct effect in the United

-30-

States." 28 U.S.C. § 1605(a)(2).  An effect is "direct" if it follows as an "immediate consequence" of the defendant's activity. Weltover, 504 U.S. at 618.  "Immediacy implies no 'unexpressed requirement of "substantiality" or "foreseeability,"' but rather 'ensures that jurisdiction may not be predicated on purely trivial effects in the United States.'" Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 237 (2d Cir. 2002) (quoting Weltover, 504 U.S. at 618).  "[T]he third clause [of Section 1605(a)(2)] does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States."  Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 894-95 n.10 (5th Cir. 1998).

Mere financial loss by a person–individual or corporate–in the United States is not, in itself, sufficient to constitute a "direct effect."  Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 726-27 (9th Cir. 1997).  However, where a contract specifies that payment is to be made in the United States, failure to do so causes a "direct effect" under Section 1605(a)(2) and jurisdiction will be found.  See Virtual Countries, 300 F.3d at 239; Voest-Alpine, 142 F.3d at 896; Adler, 107 F.3d at 727; Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 818 (6th Cir. 2002).  The parties do not dispute that they never specified where the payments were to be made.  They do, however, dispute whether jurisdiction can be

-31-

established based upon the prior course of dealing between plaintiffs and Ghana Airways.

Plaintiffs argue that where no location is expressly designated for the place of payment or performance, a party may show such location through evidence as to a history of payment or course of dealing. They further argue that Ghana Airways made its lease payments directly to their bank in Illinois.[4] They allege that defendants were aware of this practice, and as a result plaintiffs had a legitimate expectation of payment in the United States. Defendants contend that Ghana Airways' course of conduct cannot be imputed to them and there is no course of dealing between plaintiffs and defendants that would create jurisdiction under the FSIA.

In support of their proposition plaintiffs cite Global Index, Inc. v. Mkapa, 290 F. Supp. 2d 108, 115 (D.D.C. 2003), and two cases cited therein, Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1146-47 (D. C. Cir. 1994) and Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, 212 F. Supp.2d 30, 37 (D.D.C. 2002). However, the Global Index court made no such holding, stating that "this court is not tempted to be the first to find direct effects based on an implied or constructive agreement to pay in the U.S." Global Index, 290 F. Supp.2d at 114-15. Furthermore,

---

[4]The court notes that the Complaint alleges that the first month's lease payment, made prior to Ghana Airways' taking possession of the aircraft, was wired to BCI's bank in Ohio, not Illinois. Complaint, ¶ 19. Defendants do not address this inconsistency in plaintiffs' claims.

-32-

with regard to the two cited cases, the court merely stated that
they were the only ones in its circuit that had even considered
finding a direct effect not based upon an express agreement.  Id.
at 115.  The court went on to say that "because in both cases the
courts failed to find sufficient evidence that payment was
'supposed' to be in the United States, it is murky what, short of
an express designation, would fulfill the 'direct effect'
requirement." Id. At 115 n.8.  This court shares the skepticism of
the Global Index court regarding whether direct effects under the
FSIA can be based on an implied or constructive agreement to pay in
the United States.

Furthermore, as defendants note, plaintiffs allege that all
of the payments they received were made by Ghana Airways and none
were made by defendants.  As a result, any prior course of dealing
was limited to Ghana Airways, and Ghana Airways' course of dealing
cannot be imputed onto the defendants.  "[G]overnment
instrumentalities established as jurisdictional entities distinct
and independent from their sovereign should normally be treated as
such."  Bancec, 462 U.S. at 626-27.  The presumption of
independence is defeated only where a corporate entity is so
extensively controlled by its owner that a relationship of
principal and agent is created.  Id. at 629.  As stated above,
plaintiffs have not demonstrated a principal-agent relationship
between defendants and Ghana Airways.

Plaintiffs argue that they relied upon defendants' promises to pay Ghana Airways' debt and their false representations when they extended Ghana Airways' lease and ungrounded the aircraft for flights between Ghana and the United States.  These allegations form the basis of plaintiffs' quantum meruit claim.  As defendants point out, plaintiffs' quantum meruit claim is based upon the Republic of Ghana's status as sole shareholder of Ghana Airways. See Complaint ¶ 73 ("Ghana, as sole shareholder of Ghana Airways, benefited from the goods and services rendered to Ghana Airways by BCI.").  However, as stated previously, majority shareholding and majority control of a board of directors, without more, are not sufficient to establish a relationship of principal and agent between Ghana Airways and defendants.  Foremost-McKesson, 905 F.2d at 448.  Plaintiffs have not rebutted the presumption of independence between defendants and Ghana Airways.  As a result, plaintiffs cannot support their claim that defendants' assumption of Ghana Airways' debt caused a direct effect in the United States.

Defendants have demonstrated that they are entitled to immunity under the FSIA, and that none of the FSIA's exceptions apply in this case.  The court therefore lacks subject matter jurisdiction over this dispute.  Because we find that defendants are entitled to immunity under the FSIA, we find no need to address the issues of personal jurisdiction and forum non conveniens.

-34-

## **CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted.  Plaintiffs may have until November 3, 2006 to file an amended complaint if they believe they can do so consistent with counsels' obligations under Federal Rule of Civil Procedure 11.


Date:       October 13, 2006



ENTER:      _____

John F. Grady, United States District Judge